448 A.2d 18

**COMMONWEALTH of Pennsylvania**

**v.**

**Anthony FRISON, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 9, 1981.

Filed July 2, 1982.

500

Richard M. Lovenwirth, Pottstown, for appellant.

Ronald T. Williamson, Assistant District Attorney, Norristown, for Commonwealth, appellee.

Before SPAETH, POPOVICH and MONTGOMERY, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for robbery and theft. Finding none of appellant's arguments persuasive, we affirm.[1]

On December 1, 1978, Michael Zipkin, a 68 year old man, parked his car near a Pantry Pride grocery store in the Cedarbrook Mall in Cheltenham Township, Montgomery County. He went to a savings bank in the mall, where he deposited one check and cashed another. At about 4:00 p. m. he left the bank with some $100 in cash. At about 5:00 p. m. he told a Pantry Pride cashier, "I was just robbed in the parking lot." He was directed to an attendant, and told the

---

1. Appellant is required to state in the conclusion to his brief "the precise relief sought." Pa.R.App.P. 2111(a)(7). In his conclusion, appellant requests only that we discharge him; he does not request that we grant him a new trial. Nonetheless, most of his arguments, if accepted, would entitle him only to a new trial and not an arrest of judgment. However, since appellant moved below for either a new trial or an arrest of judgment, and since his arguments suggest that he is in fact requesting a new trial, we shall despite the conclusion to his brief assume that he is seeking either a new trial or an arrest of judgment. Pa.R.App.P. 105(a).

attendant that he had been robbed by a black male in his early twenties who stood approximately five feet six or seven inches and carried a small package or brief case. The attendant notified the police. While awaiting their arrival, Mr. Zipkin collapsed and shortly thereafter died from a heart attack. According to the physician who performed the autopsy, the attack was in part brought on by the emotional stress of the robbery and by the impact of a blow to the chin and neck.

Later that evening, Mr. Zipkin's car was taken to a township parking garage, where it was dusted for fingerprints. Three prints were identified as appellant's. Also, Mr. Zipkin's personal possessions were inventoried; no cash was found.

On December 30, 1978, the Cheltenham Township police were notified that appellant had been arrested in Philadelphia. When questioned by Montgomery County detectives, appellant denied any involvement in the Zipkin robbery. Appellant was questioned a second time in January 1979 and again denied any involvement, stating that he knew nothing about the robbery and was "finished" talking about it. N.T. 8/4/82 at 47.

On March 1, 1979, in response to charges arising from the Philadelphia arrest, appellant pleaded guilty to assaulting a postal employee and was sent to a federal penitentiary in Missouri. In August 1979 appellant asked to be sent to Montgomery County, pursuant to the Interstate Agreement on Detainers, so that an outstanding charge of fraudulent use of a credit card might be resolved, and in December 1979 he was brought to the Montgomery County jail. On March 3, 1980, while awaiting disposition of the credit card charge, he was again questioned about the Zipkin robbery. This time, after a formal waiver of his *Miranda* rights, he gave a detailed statement. The gist of the statement was as follows: On December 1, 1978, appellant had been at the Cedarbrook Mall, "making a couple dollars helping peoples with their packages to the cars." He helped a white male [Mr. Zipkin] with his packages. When Mr. Zipkin took out

an envelope to give him a tip, appellant saw that the envelope contained a lot of money: "[I]t looked like there was containing about $85–$90.00 and it wasn't no singles in it. So, I guess he was looking for some singles—you know—something just to give me." Appellant "just snatched [the envelope] out of [Mr. Zipkin's] hand as he went to open up the [car] door and [appellant] closed the door back and . . . took off running."

–1–

■ Appellant argues that the evidence was insufficient to sustain his conviction. This argument is without merit, for the evidence included appellant's confession. Appellant, however, would have us review his sufficiency claim without considering the confession because, he contends, the confession was invalid; therefore not properly admitted; therefore not properly part of the record. Brief for Appellant at 13.

■ This reasoning reflects a misunderstanding of the scope of our review. If we conclude that evidence should not have been admitted, we do not discharge the defendant but at most remand for a new trial. *See Commonwealth v. Fiume*, 292 Pa. Superior Ct. 54, 436 A.2d 1001 (1981). The Commonwealth may have other evidence, which we know nothing about, that if produced at a new trial might prove what had been improperly proved at the first trial. To discharge the defendant would penalize the Commonwealth for using evidence held by the lower court to be admissible.

–2–

Appellant offers several arguments in support of his contention that his confession should have been suppressed.

(a)

Appellant argues that his confession should have been suppressed because the *corpus delicti* of the theft and robbery had not been established.

■ It has long been the rule that the *corpus delicti* of a crime must be established before a confession by the accused may be admitted in evidence. *Commonwealth v. Tallon*, 478

Pa. 468, 387 A.2d 77 (1978) (opinion in support of affirmance); *Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974); *Gray v. Commonwealth,* 101 Pa. 380 (1882). To establish the *corpus delicti* the evidence must show the occurrence of a specific injury or loss, and that criminal conduct was the cause of that injury or loss. *See Commonwealth v. Tallon, supra; Commonwealth v. Ware, supra; Commonwealth v. May,* 451 Pa. 31, 301 A.2d 368 (1973); *Commonwealth v. Rhoads,* 225 Pa.Superior Ct. 208, 310 A.2d 406 (1973). *See also,* 7 Wigmore, Evidence, § 2072 (3d ed. 1940), Note, *Proof of the Corpus Delicti Aliunde the Defendant's Confession,* 103 U.Pa.L.Rev. 638 (1955). The evidence does not have to show that the accused was the person who engaged in the criminal conduct. Wigmore, Evidence, *supra.*

To establish the *corpus delicti* of the theft of Mr. Zipkin's money the Commonwealth had to show that a person "unlawfully [took] or exercise[d] unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). To establish the *corpus delicti* of the robbery, the Commonwealth had to show that in the course of committing the theft a person did one of the following:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

18 Pa.C.S. § 3701(a).

■ The evidence of the *corpus delicti* of the theft consisted of Mr. Zipkin's statement that he had been robbed and of the evidence that when his personal possessions were inventoried, they included no money despite the fact that he had been shopping and had recently cashed a check. While

"robbery" is a statutorily defined offense, "to be robbed" is commonly understood to mean that one has had something "stolen" or "unlawfully taken." Oxford American Dictionary. Mr. Zipkin's statement that he had been robbed therefore indicated that something had been taken from him. The fact that no money was found among his personal possessions indicated that what was taken from him was money. The *corpus delicti* of the robbery was established by the additional evidence of injury to Mr. Zipkin's neck and chin, indicating that his money had been taken by force.

–(b)–

Appellant further argues that his confession should have been suppressed because when the police questioned him about the Zipkin robbery, on March 3, 1980, his attorney was not present, and also, because in January 1979 he had told the police that he was "finished" talking about the robbery. Brief for Appellant at 25–26.

It will be recalled that in October 1979 appellant was brought to Montgomery County so that an outstanding charge against him of fraudulent use of a credit card might be resolved. With respect to that charge appellant was represented by counsel—Jeffrey Kroberger. Over Mr. Kroberger's advice, appellant pleaded guilty to the charge. N.T. 8/4/82 at 42. Appellant had not yet been charged with the Zipkin robbery, and Mr. Kroberger was not providing legal counsel to appellant with respect to the robbery.

■ In these circumstances we are unable to find any merit in appellant's argument that Mr. Kroberger should have been present when the police questioned him about the Zipkin robbery, on March 3, 1980. Mr. Kroberger had not been retained to represent appellant with respect to the robbery, and the matter with respect to which he had been retained had culminated in a guilty plea. Furthermore, before being questioned, appellant was told that if he wished, he could have counsel present, and he did not ask that Mr. Kroberger be present.

■ It is clear from our review of the record that the police initiated the questioning of appellant on March 3, 1980, about the Zipkin robbery. However, it is also clear that appellant had no objection to being questioned, and in fact wished to discuss the robbery with the police. *Id.* at 48–54. It is true that in January 1979 appellant had said that he did not wish to be questioned about the robbery any further, but by March 1980 appellant had had a change of heart. Thus, appellant testified on cross-examination:

Q. Mr. Frison, in the beginning of 1980, maybe the end of 1979, did you undergo some changes in your lifestyle? Specifically did you discover religion? . . . . I think the word is reborn.

A. Reborn? I discovered religion. I was raised in religion as a Christian. My self-confidence of my religion, I grew away from it. Since I've been incarcerated I picked up my religion.

Q. You picked up your religion in the latter part of 1978 or the beginning of 1979 after you had spoken with the police on those two occasions Mr. Lovenwirth [defense counsel] talked to you about, is that correct?

A. No.

Q. Do you remember you spoke with the police in December of 1979 at Broad and Champlost, I guess it was?

A. Yes.

THE COURT: December of 1978.

MR. SELIG: 1978.

Q. And in January of 1979, is that correct?

A. Yes.

Q. Then it was after that that you rediscovered religion. Is that correct?

A. Afterwards?

Q. Yes. You were incarcerated right after that.

A. I had made bail after that. After April 10, 1979 when I was sentenced by the United States Federal District, I was down for about three months and I started looking ahead for things. I started to pick back up on what I was raised and born with.

Q. Isn't it true that you wished to wrap up matters in this jurisdiction of Montgomery County back in February and March of 1980?

. . . . The credit card case—

A. Yes.

Q. And you wanted to get all that behind you. Isn't that correct?

A. Yes.

Q. With that in mind you spoke with Detective Vance about this robbery, is that correct?

. . . .

Q. Mr. Frison, I believe my question was, with this in mind, your desire to wrap things up, you spoke with Detective Vance of the Montgomery County Detectives' Office. Is that correct?

A. Yes.

N.T. 48–52 (Objections and legal argument omitted).

 Once an individual is given his *Miranda* warnings and indicates that he wishes to exercise those rights, all interrogation must cease. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Scarborough*, 491 Pa. 300, 421 A.2d 147 (1980); *Commonwealth v. Nahodil*, 462 Pa. 301, 341 A.2d 91 (1975); *Commonwealth v. Mercier*, 451 Pa. 211, 302 A.2d 337 (1973). If an interrogation continues without the presence of an attorney and a statement is taken, the Commonwealth has a heavy burden of demonstrating that the defendant knowingly and voluntarily waived his privilege against self-incrimination and his right to counsel. *Commonwealth v. Scarborough, supra.; Commonwealth v. Nahodi, supra; Commonwealth v. Youngblood*, 453 Pa. 225, 307 A.2d 922 (1973). Thus, a defendant's initial exercise of his *Miranda* rights does not foreclose a later waiver of them so long as the waiver is preceded by a complete explanation of those rights and it is clear from the record that the defendant's decision to forgo those rights was not induced by coercion, however subtle, or promises of leniency but was voluntary. *See, Common-*

*wealth v. Youngblood, supra; Commonwealth v. Grandison,* 449 Pa. 231, 296 A.2d 730 (1972); *Commonwealth v. Jefferson,* 445 Pa. 1, 281 A.2d 852 (1971); *Commonwealth v. Franklin,* 438 Pa. 411, 265 A.2d 361 (1970).

Here appellant's interrogation was preceded by a complete explanation of his *Miranda* rights, and we are satisfied that appellant's decision to forgo those rights was not induced by coercion or promises of leniency but was voluntary. *Cf. Commonwealth v. Reynolds,* 300 Pa.Superior Ct. 143, 446 A.2d 270 (1982). As shown by the testimony we have quoted, between January 1979, when he availed himself of his right to remain silent, and March 1980, when he decided to waive that right, appellant had experienced a change of heart. His decision to discuss the Zipkin robbery was prompted by his desire to admit responsibility for his past misdeeds so that he could get a fresh start on life. While we will not permit a confession produced by coercive police conduct to be considered by a jury, we will not shield an accused from a confession brought about by his own conscience.

–(c)–

Appellant further argues that his confession, and also his fingerprints, should have been suppressed as obtained in violation of the Interstate Agreement on Detainers, 42 Pa. C.S. § 9101. Appellant relies on Article V(d):

The temporary custody referred to in this agreement shall be *only* for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction. Except for his attendance at court and while being transported to or from any place at which his presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution.

42 Pa.C.S. § 9101 (emphasis added).

510

Appellant contends that because he was extradited *only* for the credit card charge, he could not be questioned about the Zipkin robbery. Brief for Appellant at 23–25.

We agree that the Commonwealth may not extradite an accused on one charge for the purpose of questioning him on another. Here, however, appellant was extradited, not to be questioned about the Zipkin robbery, but, at his own request, to resolve the outstanding credit card charge. Thus, when appellant was questioned about the Zipkin robbery, and then fingerprinted, he was being properly held on the credit card charge. Nothing in the Interstate Agreement on Detainers precludes the interrogation of someone on unrelated crimes so long as that interrogation is not the basis of his being detained or brought into the receiving state.

–4–

Appellant also argues that since he was not brought to Pennsylvania to stand trial for his involvement in the Zipkin robbery, the lower court lacked jurisdiction to try him. Brief for Appellant at 20–22. This argument may be summarily dismissed. Although brought to Pennsylvania on the credit card charge, once here, appellant formally requested, in accordance with the Interstate Agreement on Detainers, to be allowed to remain in Pennsylvania so that "a final disposition" could be rendered on the charges arising out of the Zipkin robbery. *See* Commonwealth Exhibit "C", Habeas Corpus 5/12/80.[2]

Affirmed.

**2.** Appellant's remaining arguments have been adequately disposed of by the lower court. These arguments are that the lower court erred in admitting Michael Taraborrelli's statement that Zipkin told him "he had just been robbed;" in admitting evidence of appellant's fingerprints on Zipkin's car; in permitting the Commonwealth to re-examine two excused witnesses; in failing to hold a *de novo* hearing following appellant's habeas corpus petition; and in trying appellant more than fifteen months after the commission of his offense and more than 120 days from the day he was brought into Pennsylvania.